## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **EVANSTON INSURANCE COMPANY,** *Plaintiff* | § § § § | |
| | § | **No.  1:21-CV-01129-RP** |
| **v.** | § § | |
| **RODRIGUEZ ENGINEERING LABORATORIES,** *Defendant* | § § § § | |

### REPORT AND RECOMMENDATION
### OF THE UNITED STATES MAGISTRATE JUDGE

TO:   THE HONORABLE ROBERT PITMAN
        UNITED STATES DISTRICT JUDGE

Before the Court is Evanston Insurance Company's Motion for Summary Judgment, Dkt. 13, and all associated responses and replies. The District Court referred this case for report and recommendation to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 1 of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges.

## I.        BACKGROUND

This is an insurance coverage dispute. Evanston sues Rodriguez Engineering Laboratories seeking a declaration of no coverage for a claim made against it in relation to its rendition of professional services to a highway construction project. Evanston maintains it does not owe coverage because Rodriguez failed to comply with the claim notice provisions for the excess insurance policy Evanston provided by the

1

required date of March 24, 2018. Rodriguez asserts that that there is a genuine issue of material fact as to whether Evanston had sufficient notice to trigger coverage for Rodriguez's claim under its 2016-2017 excess professional liability policy and, as such, whether Evanston owes a duty to Rodriguez defend or indemnify it against claims related to the highway construction project.

## II. LEGAL STANDARD

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come

forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

### III.     RELEVANT INSURANCE POLICY PROVISIONS

This case involves four related insurance policies and disputed coverage under two of the policies. Evanston argues that Rodriguez was required to comply with the specific terms of the notice requirements of the policies in issue and failed to do so. Rodriguez asserts that Evanston received timely constructive notice of its claims from Rodriguez's insurance broker, Gulf Coast Insurance Agency, when it contacted Evanston's insurance agent, McGowan, Donnelly, & Oberheu, LLC, about the claims. Rodriguez argues this notice to MDO, which it alleges was acting as Evanston's agent, is legally sufficient for provision of coverage.

Underwriter Lloyd's of London issued Rodriguez two identical primary professional liability insurance policies. The first policy is the Architects, Engineers and Construction Managers Professional Liability Policy No. ANE1142449.16, with a coverage period of March 24, 2016, to March 24, 2017. Dkt. 13-1. The second policy is the Architects, Engineers and Construction Managers Professional Liability Policy No. ANE1142449.17, with a coverage period of March 24, 2017, to March 24, 2018. Dkt. 13-2.

These two Primary Policies include a 12-month "Extended Reporting Period" that applies to claims first made against Rodriguez "during the Extended Reporting Period for or based upon Wrongful Acts committed or allegedly committed prior to such effective date of cancellation or nonrenewal and otherwise covered" by the policies. These policies are "claims-made and reported" policies that are "limited to those claims that are first made against the Insured and reported to Underwriters during the Policy Period" or the Extended Reporting Period.

## A.    Primary Policies' Insurance Agreement

Under the heading the "Insuring Agreement," the Primary Policies identically describe their coverages as follows:

> Underwriters will pay on behalf of the Insured all Damages and Claim Expenses in excess of the deductible and subject to the applicable Limit of Liability that the Insured becomes legally obligated to pay as a result of any covered Claim that is first made against the Insured in writing to Underwriters during the Policy Period or during any properly exercised and applicable Extended Reporting Period, for any Wrongful Act by the Insured or by anyone for who the Insured is legally responsible, provided, however, that such Wrongful Act was committed or allegedly committed on or after the Retroactive Date set forth in Item 8. of the Declarations and further provided that the Insured had no knowledge of

the actual or alleged Wrongful Act prior to the inception date of this Policy.

Dkt. 13-1, at 24; Dkt. 13-2, at 3.

### B.    Primary Policies' Claim Reporting Requirements

Under the heading "Reporting of Claims," the Primary Policies make reporting a "Claim" a condition precedent necessary to trigger coverage and provide:

> In the event a Claim is first made against any Insured, the Insured, as a condition precedent to any right to coverage under this Policy, shall: a. give written notice to Underwriters of any such Claim as soon as practicable but in no event later than sixty (60) days after the end of the Policy Period or, if applicable during the Extended Reporting Period.

Dkt. 13-1, at 31; Dkt. 13-2, at 10. The Primary Policies' Declarations require claim notices to be sent to Hiscox at "Attn: Architects & Engineers Claims Department, 520 Madison Avenue, 32nd Floor New York, NY 10022, A&Eclaims@hiscox.com."

### C.    Primary Policies' Potential Claim Reporting Requirements

Under the "Notice of Potential Claims" provision, the Primary Policies require compliance with certain conditions to later provide coverage for potential claims and state:

> If, during the Policy Period, an Insured first becomes aware of a Wrongful Act to which this Insurance applies and which might subsequently give rise to a Claim, the Insured may give written notice to Underwriters of a potential Claim during the Policy Period. Such notice must include:
>
> 1. the identity of the potential claimant;
> 2. the identity of the person(s) who allegedly committed the Wrongful Act;
> 3. the date of the alleged Wrongful Act;
> 4. specific details of the alleged Wrongful Act; and
> 5. any written notice from the potential claimant describing the Wrongful Act.
>
> If this notice is submitted to Underwriters during the Policy Period, then any Claim that is subsequently made against the Insured arising from

the Wrongful Act about which notice was given to Underwriters shall be deemed for the purpose of this Policy to have been first made during the Policy Period. This provision shall not apply to, nor shall the reporting of potential Claims be permitted during the Extended Reporting Period.

Dkt. 13-1, at 31-32; Dkt. 13-2, at 10-11. The Primary Policies included a 12-month

Extended Reporting Period. Dkt. 13-1, at 4; Dkt. 13-2, at 1.

### D.  The Primary Policies' Prior Knowledge Exclusion

The Primary Policies include what is commonly referred to as a "Prior Knowledge Exclusion," which provides:

This Policy does not apply to and Underwriters shall have no obligation to pay any Damages, Claim Expenses, or Supplemental Payments for any Claim:

* * * * *

D. alleging a Wrongful Act:

1. committed or allegedly committed prior to the Retroactive Date; or

2. which has been the subject of any notice given under any other policy prior to the beginning of the Policy Period and of which this Policy is a renewal or replacement; or

3. as to which the Insured had knowledge prior to the Policy Period and the Insured had a reasonable basis to believe that such Wrongful Act could give rise to a Claim; provided, however, that, if this Policy is a renewal or replacement of a previous policy issued by Underwriters providing materially identical coverage, the Policy Period referred to in this Section V.D.3 will be deemed to refer to the inception date of the first such policy issued by Underwriters.

Dkt. 13-1, at 28; Dkt. 13-2, at 34.

### E.  The Excess Policies

Evanston also issued to Rodriguez as the "Named Insured" an Excess Follow

Form Policy No. MAX7PL0002186 with a coverage period from March 24, 2016, to

March 24, 2017. Dkt. 13-3.  Evanston then issued to Rodriguez as the "Named

Insured" an Excess Follow Form Policy No. MKLV7PL0002623 with a coverage period from March 24, 2017, to March 24, 2018. Dkt. 13-4. The Excess Policies state "Followed Policy means the policy designated as such in Item 4 of the Declarations." Dkt. 13-3, at 4, and Dkt. 13-4, at 11. Excess Policy I designates Primary Policy I in the Declarations as the "Followed Policy." Dkt. 13-3, at 6. Excess Policy II designates Primary Policy II in the Declarations as the "Followed Policy." Dkt. 13-4, at 10.

Since the Excess Policies are Followed Form policies, each policy for its coverage period incorporates the 12-month Extended Reporting Period applicable to the Primary Policies they follow. The Excess Policies state that "[e]xcept as otherwise stated in this Policy, the Insurer shall provide the Insureds with insurance in accordance with the terms, conditions and exclusions set forth in the Followed Policy and, to the extent coverage is further limited or restricted thereby, in any other Underlying Insurance." Dkt 13-1, at 4; Dkt. 13-4, at 11. As a result, the Excess Policies follow the Primary Policies and are "limited to those claims that are first made against [Rodriguez] and reported to [Evanston] during the Policy Period" or the Extended Reporting Period. Dkt. 13-1, at 4; Dkt. 13-2, at 1.

### F.   The Excess Policies Insuring Agreement

Pursuant to the "Insuring Agreement," the Excess Policies set out the coverages, subject to any applicable exclusions. In that regard, the Excess Policies provide:

> Except as otherwise stated in this Policy, the Insurer shall provide the Insureds with insurance in accordance with the terms, conditions and exclusions set forth in the Followed Policy and, to the extent coverage is further limited or restricted thereby, in any other Underlying Insurance.

7

> Liability shall attach to the Insurer only after the insurers of the Underlying Insurance, the Insureds or an excess difference-in-conditions ("DIC") insurer pay in legal currency as loss covered under the Underlying Insurance the full amount of the Underlying Limit. The Insurer's maximum aggregate liability for all Loss covered under this Policy shall be the Aggregate Limit of Liability as stated in Item 3 of the Declarations.

Dkt. 13-3, at 4; Dkt. 13-4, at 11.

The parties do not dispute that the only Followed Policy and/or Underlying Insurance as those terms are defined in the Excess Policies are the Primary Policies for each respective coverage period.

### G.      The Excess Policies' Notice of Claims and Potential Claims

The Excess Policies have their own claim notice reporting provisions:

> Notice to the Insurer shall be given at the respective address shown in Item 5 of the Declarations. Any notice to the insurer of Underlying Insurance shall not constitute notice to the Insurer unless also given to the Insurer as provided above.

Dkt. 13-3, at 4; Dkt. 13-4, at 11. Item 5 of the Declarations are the same for both a claim or potential claim and require:

NOTICE TO THE INSURER:

| A. Notice of Claim or Potential Claim: | B. All other notices: |
|---|---|
| Claims Manager | Underwriting Department |
| Evanston Insurance Company | Evanston Insurance Company |
| P.O. Box 2009 | 1185 Avenue of the Americas |
| Glen Allen, VA 23058 | New York, NY 10036 |
| Fax: 1-855-662-7535 | Fax: 1-212-898-6601 |
| Email: newclaims@markelcorp.com22 | |

Dkt. 13-3, at 3; Dkt. 13-4, at 7.

8

### IV.   FACTUAL BASIS OF SUIT

The following facts are not in dispute.  Rodriguez is an engineering firm that provides services in the areas of construction project quality control and testing. Rodriguez is contractually required to carry primary and excess professional liability insurance policies in the performance of the services it provides. Rodriguez was contracted to provide engineering services for a project related to the construction of a State Highway 130, while it had certain insurance policies in place: a primary professional liability errors and omissions policy from Hiscox, obtained through Lloyd's of London, and an excess professional liability errors and omissions policy from Evanston Insurance Company obtained through McGowan Donnelly & Oberheu, LLC ("MDO"). Dkt. 19-1, at 5-54.

On September 21, 2016, Rodriguez was provided with correspondence from Central Texas Highway Constructors, LLC ("CTHC"), indicating that CTHC had been put on notice that the project suffered from alleged defects including pavement and slope failures, among other issues. Dkt. 19-1, at 55-58.  CTHC indicated that the alleged defects potentially involved the work or services of Rodriguez and that Rodriguez may be liable for damages claimed by the developer related to the alleged defects. *Id.* The letter also demanded that Rodriguez notify its insurance carriers of the claim. *Id.*

Pursuant to its receipt of CTHC's correspondence, Rodriguez requested that its insurance broker, Gulf Coast Insurance Agency, provide notice to its insurance carriers related to the allegations contained in CTHC's letter. Gulf Coast, in

accordance with the prior course of conduct Rodriguez and Gulf Coast had engaged in related to notices of insurance claims, provided notice to MDO, the insurance agent of Rodriguez's  professional liability policies with both Hiscox and Evanston, who in turn provided notice of the claim to Rodriguez's primary carrier, Hiscox. Dkt. 19-1, at 2-3. Notice was provided to MDO regarding CTHC's September 21, 2016, correspondence by Gulf Coast on October 6, 2016. Dkt. 19-1, at 56-58. After receipt of this notice, Hiscox accepted coverage under its 2016-2017 policy. Dkt. 19-1, at 69-71. Although MDO provided notice to Hiscox, it apparently did not provide notice to Evanston as the excess carrier at the same time. This is evident from correspondence between MDO and Markel stating "McGowan did not notify the excess carrier (Evanston) of the loss in question until 2020 …. McGowan did not place Evanston on notice because it was waiting for a Hiscox determination regarding the size and scope of the claim (and whether, therefore, the claim should be reported to Evanston, the excess carrier). When McGowan was asked to notify Evanston in 2020, it did so." Dkt. 19-1, at 60.

Rodriguez subsequently received additional requests for defense and indemnity from CTHC. These requests were dated November 17, 2017, Dkt. 13-8; January 26, 2018, Dkt. 13-9; and April 13, 2018, Dkt 13-10.  In the January 26, 2018, request, the Wilson Elser law firm, on behalf of CTHC, sent a letter to Rodriguez's attorney requesting that Rodriguez provide defense and indemnity to CTHC regarding the alleged defects on the project pursuant to the subcontracts Rodriguez had entered into with CTHC. Dkt. 19-1, at 73-75. In its correspondence, Wilson Elser

carbon copied MDO. *Id.* Gulf Coast also provided a copy of the January 26, 2018, correspondence from Wilson Elser to Ashley Hamilton, Assistant Vice President of MDO, on February 14, 2018. Dkt. 19-1, at 78. Ashley Hamilton acknowledged receipt and indicated that MDO would "get this over to the carrier for review." *Id.*

Evanston did not receive the State Highway 130 dispute claim against Rodriguez until February 18, 2020, approximately two years after the end of Excess Policy I's Extended Reporting Period and over three years after the report to Hiscox. Dkt. 13-12; Dkt. 13-6. Evanston denied coverage under Excess Policy I because Rodriguez failed to comply with the reporting requirements of the Policy. Rodriguez then sought coverage under Excess Policy II, based on the assertions that the Policy contained a March 24, 2018, expiration date, with a March 24, 2019, extended coverage date, and Rodriguez notified Markel about the Notice of Arbitration in the underlying case on June 28, 2018.  Dkt. 13-3, and Dkt. 13-15. Evanston denied coverage under Excess Policy II, asserting that the underlying highway dispute is excluded from coverage under Policy II as a "Wrongful Act which has been the subject of any notice given under any other policy prior to the beginning of the Policy Period and of which this Policy is a renewal or replacement." Dkt. 13-2, at 7.

## V.    SUMMARY JUDGMENT ANALYSIS

Evanston argues it is entitled to summary judgment as the plain language of the Policies in issue preclude coverage. First, it asserts that Rodriguez failed to timely report the highway claim to Evanston under Excess Policy I, as that Policy specifically requires. Additionally, it argues that Excess Policy II does not provide coverage

because coverage was not provided by Primary Policy II, along with the Prior Acts Exclusion, and the "fortuity doctrine".

Rodriguez responds that it provided notice to MDO which MDO acknowledged well before the expiration of Evanston's extended coverage period. Additionally, Rodriguez argues that Thomas B. McGowan IV, MDO's President and CEO of its parent company, The McGowan Companies, clearly acknowledged that MDO is an appointed agent of Evanston, which is a subsidiary of Markel Corporation. Dkt. 19-1, at 60-61; Dkt. 19-1, at 80-81. Because, Rodriguez argues, MDO, as an agent of Evanston, was aware of the notices sent to Rodriguez on behalf of CTHC since 2016, when Hiscox first accepted the claim, MDO was aware of them in February 2018, prior to the expiration of Rodriguez's Evanston policy extended coverage period. Rodriguez argues that because MDO had knowledge and was acting as Evanston's agent through its custom and practice with Rodriguez in forwarding claims to carriers, Evanston had constructive notice of the claim prior to the expiration of the policy's coverage period. Rodriguez argues that summary judgment is improper in this case because there is a genuine issue of material fact as to whether Evanston had sufficient notice to trigger coverage for Rodriguez's claim under its 2016-2017 excess professional liability policy and as such, whether Evanston owes a duty to Rodriguez to defend or indemnify Rodriguez against claims related to the State Highway 130 project.

### A.       Failure to Timely Report Claim As Required by Policy

The parties do not dispute that Texas law applies and that the general rules of contract construction are used to interpret insurance policies. Under Texas law, insurance policies are contracts that establish the respective rights and obligations to which an insurer and its insured have mutually agreed. *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 488 (Tex. 2018). Texas courts construe insurance policies using the same rules that govern the construction of any contract. *Id*.

The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument and to ensure contract terms are construed according to "the ordinary, everyday meaning of the words to the general public*." Exxon Mobil Corp. v. Ins. Co. of State*, 568 S.W.3d 650, 657 (Tex. 2019) (quoting *Progressive Cnty. Mut. Ins. Co. v. Sink*, 107 S.W.3d 547, 551 (Tex. 2003)). The most important consideration in interpreting the meaning of a contract is "the agreement's plain, grammatical language." *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020). To that end, the terms used in the policy are given their plain, ordinary meaning unless the policy itself shows that the parties intended the terms to have a different, technical meaning. *Exxon Mobil Corp.*, 568 S.W.3d at 657. Additionally, under Texas law, "the insured has the burden of establishing coverage under the terms of the policy*." JAW The Pointe, L.L.C. v. Lexington Ins. Co.*, 460 S.W.3d 597, 603 (Tex. 2015).

     1.    Coverage Under Excess Policy I

In this case, Evanston argues that Rodriguez cannot establish coverage due to its untimely report of the highway claim under Excess Policy I, which it asserts is the only potentially applicable excess policy. Dkt. 13, at 13-14.

The summary judgment evidence establishes that Excess Policy I is the only Followed Form policy to the Underlying Insurance in Primary Policy I. Excess Policy I specifically scheduled Primary Policy I as the only "Underlying Insurance" identifying the "Primary Carrier Underwriters at Lloyd's, London Policy Number ANE1142449.16." Dkt. 13-4, at 10. Additionally, Excess Policy I only provides coverage "in accordance with the terms, conditions and exclusions set forth in the Followed Policy and, to the extent coverage is further limited or restricted thereby, in any other Underlying Insurance." Dkt. 13-3. The Fifth Circuit has held a "'following form' excess policy incorporates by reference all terms and conditions of the primary insurance policy." *Bayou Steel Corp. v. Nat'l Fire Ins. Co*, 642 F.3d 506, 510 (5th Cir. 2011). Hiscox in its coverage acknowledgement letter solely referenced Policy ANE1142449.16, Policy I. Dkt. 13-3, at 6. In this case, Hiscox has extended coverage under Primary Policy I, thereby excluding coverage under Excess Policy II, as no coverage was provided under Policy II, as required under the relevant policy language. There is no evidence that Hiscox offered coverage of the highway claim under Primary Policy II.

Evanston argues that unless there is an express exception to the form of the primary insurance, the excess carrier must act according to the primary insurance

policy's terms. *See Hartford Acc. & Indem. Co. v. Pacific Ins. Co.*, 862 F. Supp. 160, 162 (S.D. Tex. 1994).   Here the Excess Policies provide:

> Notice to the Insurer [Evanston] shall be given at the respective address shown in Item 5 of the Declarations. Any notice to the insurer of Underlying Insurance [Hiscox] shall not constitute notice to the Insurer unless also given to the Insurer [Evanston] as provided above.

Dkt. 13-4, at 6. The address referenced is Evanston Insurance Cpnay, P.O. Box 2009, Glen Allen, VA 23058, and newclaims@markelcorp. Dkt. 13-3, at 3; Dkt. 13-4, at 7. Evanston argues that under Texas law. "[c]ourts strictly interpret notice provisions in a 'claims-made' policy." *Matador Petroleum Corp., v. St. Paul Surplus Lines Ins. Co.*, 174 F.3d 653, 659 (5th Cir. 1999). Additionally, Evanston argues that under Texas law it is well established that "an insurance company may deny coverage under a 'claims-made' policy without a showing of prejudice." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Willis*, 296 F.3d 336, 343 (5th Cir. 2002).  Evanston also points out that both Excess Policies contain language stating that notice "shall" be given to the identified address listed in Item 5 of the Declarations, which Rodriguez did not do. And that because of Rodriguez's failure to comply with the notice provisions of Excess Policy I, its denial of coverage is proper.

> 2.     Coverage Under Excess Policy II, Prior Knowledge Exclusion

Evanston argues that, along with the fact that coverage is required under Policy II to implicate coverage under Excess Policy II, and that did not occur, Excess Policy II also does not apply because of the Prior Knowledge Exclusion set out in full above. Dkt. 13-1, at 31-31; Dkt. 13-2, at 10-11. Evanston argues that the Prior Knowledge Exclusion provides that since the highway claim "has been the subject of

any notice given under any other policy," (Policy I) that claim is excluded under Primary Policy II, which is the Underlying Insurance/Followed Form scheduled in Excess Policy II. Rodriguez reported to Hiscox the Initial Notice of the highway dispute claim and Hiscox acknowledged coverage for that claim in its October 25, 2016, letter. Excess Policy II incepted on March 24, 2017. Rodriguez also received other demand letters providing knowledge of the highway dispute claim prior to inception of Excess Policy II. Evanston argues that under Texas law, prior knowledge exclusions are valid and in this case bars coverage under Excess Policy II.

Lastly, Evanston argues that coverage is precluded under the fortuity doctrine. Under this doctrine, an insured is not permitted to insure against a loss that has already begun or one that is known about before an insurance policy incepts. *Summers v. Harris*, 573 F.2d 869, 872 (5th Cir. 1978).

Rodriguez, apparently conceding these arguments, does not address them; and instead, asserts that Evanston did in fact receive timely *constructive* notice of its claims when Gulf Coast notified MDO. Thus, unless Rodriguez can establish a genuine issue of material fact regarding notice, Evanston's arguments prevail. *See United States v. Reagan*, 596 F.3d 251, 254 (5th Cir. 2010) (holding that a failure to adequately brief an argument results in waiver). "Generally, the failure to respond to arguments constitutes abandonment or waiver of the issue." *Abraham v. Greater Birmingham Humane Soc. Inc.*, No. 2:11-CV-4358-SLB, 2013 WL 1346534, at *4 (N.D. Ala. Mar. 28, 2013); *In re Online DVD Rental Antitrust Litig.*, No. M 09-2029 PJH, 2011 WL 5883772, at *12 (N.D. Cal. Nov. 23, 2011) (absent unusual

16

circumstances, failure to respond to argument on merits "viewed as grounds for waiver or concession of the argument").

### B.    Rodriguez's Constructive Notice Argument

Acknowledging it did not provide notice as required by the Policies, and addressing none of Evanston's other arguments, Rodriguez asserts as follows:

> While it is true that [Rodriguez] was not relieved of its notice obligations under its policy with Evanston, because of the custom and practice it had previously maintained with Gulf Coast and MDO regarding reporting and notices of claims or potential claims, and because there was never an issue with [Rodriguez's] reporting claims in this manner, [Rodriguez] relied on MDO's apparent authority as an agent of Evanston/Markel in providing its claim to MDO to tender to Evanston. Rodriguez correctly assumed that providing notice of both the September 21, 2016 correspondence, as well as the January 26, 2018 correspondence issued on behalf of CTHC to MDO was sufficient to trigger coverage under the 2016–2017 policy, or—at the very least— under its extended coverage period, which ended on March 23, 2018. Rodriguez relied on this agency relationship in its conclusion that its carriers were timely notified of its claims related to CTHC and the construction Project. Evanston, through its agent MDO, had constructive notice of Rodriguez's claims since at least February 2018, and arguably since October 2016. As such, there is a genuine issue of material fact related to whether Evanston was timely notified of Rodriguez's claim in order to provide coverage to Rodriguez under the 2016–2017 excess policy it maintained with Evanston.

Dkt. 19, at 7. In sum, Rodriguez relies on the past actions of his agent and broker in properly reporting past claims to the insurer, to assert that he could rely on that same custom and practice in this instance, to establish constructive notice of the claim to Evanston, where those parties failed to properly report its claim. To support this argument, Rodriguez asserts an agency theory. It is a fundamental rule of agency law that notice to the agent constitutes notice to the principal. *Minter v. Great American Ins. Co. of New York*, 423 F.3d 460, 472 (5th Cir. 2005).

Rodriguez argues that MDO served as Evanston's agent, and since the parties had a custom and practice of Rodriguez submitting its claims to Gulf Coast, Gulf Coast forwarding those claims to MDO, and MDO notifying the carriers, MDO was cloaked with the apparent authority of Evanston's agent for the receipt of claims. Thus, Rodriguez maintains, notice to Gulf Coast was sufficient to notify Evanston. The parties do not dispute that this method of reporting claims occurred in the past with other carriers, and was the method Hiscox was notified of Rodriguez's claim. Accordingly, Rodriguez argues Evanston is estopped from denying MDO acted as its agent because "that person has authority to perform various functions on the insurer's behalf." Dkt. 19, at 5 (citing *Kootenai County v. Western Cas. & Sur.*, 750 P.2d 87 (Idaho 1988) (agent who (1) took applications, (2) countersigned and delivered policies, (3) collected and remitted premiums, and (4) transmitted claims on behalf of the insurer, was clothed with apparent authority to bind the insurer)).

Rodriguez further argues in support of its agency theory that MDO maintained a contractual Producer Agreement with Evanston, a Markel subsidiary. Dkt. 19-9. In this Agreement, MDO (defined within as "Producer") was required to "immediately notify [Evanston and/or any Markel affiliate or subsidiary] (defined as "the Company") of all claims, suits and notices, and [] when and as reasonably requested by the Company, cooperate fully with the company to facilitate the investigation and adjustment of any claim or suit, arising out of business placed by Producer with the Company." *Id.* Rodriguez argues that "while the Agreement does not expressly create a contractual agency relationship between MDO and Evanston, the actions taken and

course of conduct established between them does." Dkt. 19, at 6. Rodriguez asserts that MDO maintained the apparent authority to act as Evanston's agent to receive and forward claims, and Rodriguez relied on such authority when submitting claims to Evanston through MDO as its agent.

Evanston responds that Rodriguez cannot establish an agency relationship between Evanston and MDO sufficient to support its constructive notice argument. The undersigned agrees.

"[G]enerally speaking, an insurance broker is considered the agent of the insured; if the insured reports a claim to the broker, but the broker fails to report it to the insurer, the insured is not relieved of his notice obligations." *Duzich v. Marine Office of Am. Corp.*, 980 S.W.2d 857, 865 (Tex. App.—Corpus Christi 1998, pet. denied). However, "under some narrow sets of circumstances, an insurance agent may be deemed to have acted as the agent of both the insured and the insurer." *Monumental Life Ins. Co. v. Hayes-Jenkins*, 403 F.3d 304, 314 (5th Cir. 2005). Texas courts have found that an "insurance agent can act as the agent of both the insured and the insurer by collecting the premium and delivering the policy for the carrier, and by procuring insurance for the insured." *Maintain, Inc. v. Maxson-Mahoney-Turner, Inc.*, 698 S.W.2d 469, 472 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e). When an agency relationship has been demonstrated, a "principal is liable for the acts of its agent when the agent has actual or apparent authority to do those acts or when the principal ratifies those acts." *Spring Garden 79U, Inc. v. Stewart Title Co.*, 874 S.W.2d 945, 948 (Tex. App.—Houston [1st Dist.] 1994, no writ). An agent has

19

actual authority, binding on the principal, when the principal intentionally confers the authority, intentionally allows the agent to believe that it has the authority, or carelessly allows the agent to believe it possesses the authority. *Id.* "Express authority is delegated to an agent by words that expressly and directly authorize the agent to do an act or series of acts on behalf of the principal." *Crooks v. MI Real Estate Partners, Ltd.*, 238 S.W.3d 474, 483 (Tex. App.—Dallas 2007, pet. denied).

Evanston asserts that under the Producer Agreement, MDO's authority is limited to insurance policy issuance and premium collection functions. Thus, to the extent MDO might have any authority as Evanston's agent, that authority was limited, and did not include receipt of claims notices.

The Producer Agreement explicitly states that "Producer [MDO] is acting as an independent contractor with respect to the Company. This Agreement does not create any employer employee, joint venture, partnership, agency or exclusive relationship between Producer and the Company." Dkt. 19-9, at 109. Evanston argues that this language is sufficient to support that no agency relationship exists.

In *Berkely Reg'l Ins. Co. v. Philadelphia Indem. Ins. Co.*, No. A-10-CA-362-SS, 2013 WL 6145979, at *6 (W.D. Tex. Nov. 21, 2013), *aff'd*, 600 F. App'x 230 (5th Cir. 2015), the Court considered whether an insurance company had received constructive notice where a purported agent had been notified by an insured of an underlying claim. The insured argued that a series of agent agreements executed by the insurance company created an agency relationship, supporting its claim of constructive notice. *Id.* at *4. The Court, however, denied the existence of constructive

20

notice and found that these agreements failed to explicitly confer actual authority on the representatives to receive claims in this manner. *Id.* at *4-7. The Court noted that the agreements expressly provided that the representatives were not the agents of the insurance company, and that they had "no authority, express or implied to bind [the insurance company] or any of its principals." *Id.* at *4. Further, the Court found that the agreements "contained no express grant of authority to accept notice of claims." *Id.* at *5. In this case, similar to *Berkley*, the undersigned finds that the parties expressly agreed that MDO was *not* Evanston's agent and that the Producer Agreement contains no express grant of authority to receive notice of claims. This case, however, differs somewhat from *Berkley*, where the court found that "the agreement is silent as to any authority CIA has to accept notice of claims filed against any policy ultimately issued by Philadelphia." *Id.* at *5.

In this case, Rodriguez relies on the language of the Producer Agreement to support his constructive notice agency argument. The Producer Agreement states that MDO as the "Producer will (i) immediately notify the Company of all claims, suits, and notices." Rodriguez argues that this clothed MDO with "apparent authority to act as Evanston's agent to receive and forward claims." Dkt. 19, at 6 (citing Dkt. 19-1, at 111).

In *Houston Orthopedic Surgical Hospital v. Steadfast Ins. Co.*, No. H-11-CV-3916, 2014 WL 12600169 at *5 (S. D. Tex. 2014), the court addressed a similar situation, in which the insured notified its broker of a claim, and the broker allegedly failed to forward the claim to the insurer. In *Houston Orthopedic*, the broker claimed

an agency relationship with the insurer, arguing that notice to the broker qualified as constructive notice to the insurer, thereby absolving it from its failure to pass along the claim. The court found that, despite language, almost identical to that found in the Producer Agreement in this case, requiring the broker to forward all notice of claims to the insurer, the insurer did not confer actual authority to the broker to receive claims from insureds sufficient to clothe the broker with the actual authority of the insurer. *Id.* The court based its reasoning on: (1) the language in the agreements limiting the broker's authority; and (2) the fact that the agreement contained no express grant of authority to accept notice of claims. *Id.*

> The court specifically found of the language stating that the broker:
>
> will immediately forward written notice to [insurer] of all claims suits or proceedings … is not an express grant of authority to [broker] to receive claims on [insurer's] behalf. The language in fact suggests the opposite; that [broker] did not have the authority to receive claims on [insurer's] behalf, and was instead obligated to forward such claims to the insurance company.

*Id.* at *6. Ultimately, the court determined that the parties' agreement did not create actual authority for the broker to receive claims for the insurer, such that the insurer had constructive notice of the insured's underlying claim.

The undersigned finds the cases discussed above are on point and persuasive. Rodriguez has failed to establish through the Producer Agreement that MDO acted as Evanston's agent for purposes of the receipt of Rodriguez's claims, and therefore cannot establish constructive notice of the claims.

Additionally, the summary judgment evidence establishes that Evanston never ratified the acts of MDO and permitted it to receive notices of insurance claims.

"A court may consider only the conduct of the principal leading a third party to believe that the agent has authority in determining whether an agent has apparent authority." *Elite Towing, Inc. v. LSI Fin. Grp.*, 985 S.W.2d 635, 642-43 (Tex. App.—Austin 1999, no pet.). While Rodriguez submits summary judgment evidence that in the past it was its practice to submit claims to Gulf Coast, who then forwarded the claims to MDO, who then forwarded those claims to the insurer, there is no evidence that MDO forwarded the claims to Evanston. Dkt. 19-1, at 1-3. Further, there is no evidence that MDO had a past practice of forwarding the claims to Evanston, as only other insurers are mentioned in the summary judgment evidence. *See Berkley*, 2013 WL 6145979, at *6 (finding that the parties' course of dealing in forwarding the notice to the insurer, coupled with the broker's failure to forward the notice to the carrier, did not relieve the insured of its obligation to notify the insurer). Nor is their any evidence that Rodriguez interacted with Evanston

Under Texas law, Rodriguez has the burden of proving that an agency relationship exists and the extent of the authority conveyed upon the agent. In this case, Rodriguez has failed to submit summary judgment evidence supporting his claim that MDO had the actual authority to receive claims for Evanston such that Evanston had constructive notice of Rodriguez's claims. *See Berkley*, 2013 WL 6145969, at * 5 (finding that lack of contact between the insured and purported agent for the receipt of notice of claim negates finding that insurance broker is acting as agent of insurer). Because the policy provisions regarding notice are controlling, and

Rodriguez failed to timely submit claims under those provisions, summary judgment is proper in this case.

## VI.      RECOMMENDATION

In accordance with the foregoing discussion, the undersigned **RECOMMENDS** that the District Court **GRANT** Evanston Insurance Company's Motion for Summary Judgment, Dkt. 13, and **DISMISS** Plaintiff Rodriguez Engineering Laboratories' claims **WITH PREJUDICE**. The referral in this case is hereby **CANCELED**.

## VII.      WARNINGS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).  A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED January 20, 2023.


DUSTIN M. HOWELL
UNITED STATES MAGISTRATE JUDGE